HALL & HAMMOND and WRIGHT & BECK, for defendant.

---

NAPIER et al. v. NAPIER.

Where executors are directed by the will to lay off land in one acre lots before selling it, and they are proceeding, after laying off the tract into lots not of an acre but of less dimensions, to offer the tract for sale as a whole, it is no abuse of discretion to enjoin the sale at the instance of legatees whose interest in the estate depends upon the amount realized by the executors in conducting the administration. Executors selling solely under authority delegated by the will should pursue the power, and comply with the testator's directions as to preliminaries.    *Judgment affirmed.*
March 26, 1892. By two Justices. Argued at the last term.

Executors and administrators. Injunction. Before Judge MILLER. Bibb county. At chambers, November 9, 1892.

The exception is to the granting of an injunction, on the petition of the widow and children of E. T. Napier, one of the sons and legatees of Leroy Napier, restraining, until the final hearing, the executors of

Leroy Napier from selling or attempting to sell certain property, or from attempting to carry out the provisions of an agreement hereafter mentioned, or from doing any act contrary to the direction and provisions of his will. This will was probated in December, 1870. The first item directed payment of his debts. By the second item the dwelling-house of testator and the ninety acres of land on which it stood, with carriage, horses, furniture, stock, etc. appertaining thereto, were bequeathed to his wife M. L. Napier, upon express condition that she should relinquish dower in any portion of the real estate of which he died possessed, within sixty days after the will should be proved and the executors qualified, after the signing of which relinquishment the homestead and property should fully belong to her in fee simple. By the third item he provided that his estate, except the portion bequeathed to his wife in the second item, should belong to his wife and children equally, and be distributed between them in equal portions as soon as the same could be marshalled and prepared for distribution by his executors, living children taking their share, and the heirs of any dead child taking the portion the parent would have been entitled to if living. By the fourth item he directed that, so soon after his death as should be deemed practicable, his executors should have his "swamp land," below and adjoining the city of Macon, divided in lots of ten acres each, in ranges, leaving a sufficient space between them to render all accessible, and a "pine lot" of which there were about ninety acres, adjoining the property bequeathed to his wife in the second item, laid out in one acre lots, in ranges, leaving sufficient space between them to make them accessible, so as to make them more valuable as building lots; and that his executors sell his Alabama lands in quarter sections of one hundred and sixty acres each, as they might deem most

v 89-4

advantageous for the interest of his estate, and all his other lands in such manner as they might deem best for the general interest of the estate. By the fifth item he stated that he had advanced to several of his children and heirs considerable sums, to wit: to his sons E. T. and N. M. $30,000 each, to his son B. H. $5,000, to his son-in-law Welsman $10,000, and to his son-in-law Chaille $5,500 ; and he directed that in the distribution of his estate these advancements should be accounted for, so that all his heirs should share alike, but that if it should be found in marshalling his estate that each share should not be of the value of $30,000, then the two shares to which $30,000 each had been advanced should not be required to return or account to the estate for the surplus so advanced above the value of their share, but the advance should be regarded as cancelled. He appointed his wife executrix, his sons Leroy, E. D., B. H., H. V., G. C. and N. M. Napier, and his sons-in-law Welsman and Chaille, executors. Only B. H., H. V., and G. C. Napier qualified as executors. The testator's widow, and his children Mrs. Chaille, N. C., B. H., E. D., H. V. and G. C. Napier, survived him. Mrs. Welsman had died leaving a husband and child, and the husband and father of petitioners had died. Shortly after testator's death and before the probate of the will in solemn form, an agreement was signed by the widow, by Welsman as guardian for his daughter, by Chaille and his wife, and by N. C., B. H., Edward, H. V. and G. C. Napier, reciting that the undersigned, as heirs and legatees of Leroy Napier, desired to close and settle up his estate as far as it could be done ; that it was not desired to sell the property at a sacrifice, as would be apt to be the case if the sale were made at that time ; that several of the undersigned had received advances from the testator since the date of his will, which it was desirable to ascertain and agree on ; and

that for the purpose of agreeing and settling all the above questions, and any others that might be embraced therein, the undersigned, who were all the heirs and legatees, except the minor children of E. T. Napier, deceased, who had been advanced $30,000, a sum supposed to be larger than would be coming to the other heirs and legatees, agreed: The spirit and intention of the will should be carried into effect, except as the same might be changed and modified by this agreement. Welsman had been advanced $10,000 which was to be charged as such to his daughter. Chaille and his wife had been advanced $8,580, which was to be charged to them as such. B. H. Napier had been advanced $6,000, to be charged to him as such. Edward Napier was indebted to the estate a note for $12,000 with interest, and also $7,098.35 furnished him, and of which he was to retain an amount as an advancement to make him equal with the other children, and any balance to be a debt which he was to secure by mortgage on his Alabama plantation. H. V. Napier owed the estate $8,000 without interest, also $5,823.80, out of which he was to retain an amount as an advancement to make him equal with the other children, the balance to be a debt he would owe the estate, for which he would give proper assurance. G. C. Napier owed the estate $13,855 out of which he was to pay $3,500 to the estate and $1,500 to his mother, in lieu of which two payments he was to have the crop of the "swamp place" that year (part of the advancement having been made by his father to make the growing crop on that place), and the balance to be charged to him as an advancement. It was further agreed that the widow should have the above $1,500, the rent of the "swamp place" for 1870, and for and during her natural life the estate, use and income of the following property: the "swamp place," the stock (supposed to be $12,000) of the Macon Manufact-

uring Company, the debt or note due by one Moultry together with any mortgage or security that had been or might be given to secure it, the residence of testator, including about ninety acres of land with all the improvements, furniture, carriages, horses and other personalty attached thereto or used as a part of it, and $500 in cash, which sum, as also the $1,500, to be paid her by G. C. Napier for the rent of the "swamp place" for 1870, was to be hers absolutely in fee. It was further agreed that, in order to give the widow a sufficient income that she might be at ease and quiet in her advancing years, the other parties to the agreement, except N. C. Napier, would each pay her each year during her life $250, these annual payments to be a charge and lien on their share of the property, in which by this agreement she was to have a life-estate and at her death all of which was to descend and go to the six of the heirs and legatees, and their heirs in case any should be dead, who united in this article. In consideration of these provisions for the widow, she agreed to relinquish her dower, year's support, distributive shares and all other interest and rights in the estate of her husband, whether under his will or in any other way belonging to her. It was also agreed that N. C. Napier was to have and receive the property in Walker county, known as the "Henry place," in full of all his claims to or interest in the estate, unless the estate would distribute to each more than his advancements; that for the purpose of managing the estate and carrying out the will and this agreement with more convenience to the parties, B. H. and G. C. would qualify as executors in Georgia, and Edward and H. V. Napier as executors in Alabama; and that so soon as the executors could do so consistently with the interest of the estate, they would proceed to equalize the advancements by sale of the property not in the agreement specifically disposed

of, leaving the property in which Mrs. Napier had a life estate to be distributed at the termination of her estate.

The petition was against those who had qualified as executors, and alleged: Petitioners were not parties to this agreement whereby the will was modified in various important particulars to which attention was called. It seeks to change the will and exclude petitioners from any participation thereunder in the estate. Having been made a very short time after testator's death and prior to the probate of the will, the agreement has been substituted for the will, and the executors have acted under it in the administration of the estate, and not in accordance with the will. They have not divided the "swamp lands" nor laid out the "pine lot" as directed by the will; they have sought to convert the fee simple estate of the widow in the homestead and ninety acres adjacent, and the personalty, into a life-estate only, and to appropriate the fee after the widow's death to themselves and the other legatees (the widow excepted) who, with them, are parties to the agreement; by entering into the agreement they have sought to appropriate all the other property of the estate in a different way from that provided by the will, and for their own benefit, to the entire exclusion of petitioners, the agreement providing that the income from a large part of the other property in which petitioners are interested under the will, should be applied in part payment of the consideration for the relinquishment by the widow to them and other parties to the agreement of her estate in fee, and for her consent to retain a life-estate only in the property heretofore mentioned; and they have utterly failed to administer the estate under the will or to attempt any distribution in accordance with it, but from the date of the agreement to the present time have acted under it and not under the will, and they are taking steps still further to do so as will hereafter appear. The

widow did not understand the agreement when she signed it, as it is interpreted and sought to be carried out by the executors and other parties thereto, but she understood it to provide that the property given her by the will should go to all her children and the legal representatives or heirs at law of such as should die before her death, in equal proportion, as provided in the will touching the other property disposed of by the will; and that petitioners should participate in the distribution of the property given her by the will, in the same manner and under the same conditions as her other grandchildren. If she were permitted to do so, she would now sign an instrument declaring such to have been her understanding and purpose. She stated to one of petitioners that such was her understanding and intention, and that she desired, if necessary, to execute a paper so declaring, and requested him to have such a paper drawn, which was done, but G. C. Napier prevented her from signing it and stated that she should not sign any paper on the subject. She repeated in substance the same thing a few days ago to another of petitioners. The executors are now advertising the "pine lot," which is still a part of the property of the estate subject to distribution under the will, to be sold at private sale, either entirely or in part, and if the sale cannot thus be made, to be sold at public sale on the first Tuesday in November, 1891. One of the chief objects inducing this is to raise money to enable G. C. Napier to pay off a mortgage or mortgages on lands owned by him in Alabama. If this property is sold, its proceeds will be distributed under the agreement and not in accordance with the will. The land so offered has not been laid out into building lots as directed by the will, and any attempt to sell it in its entirety is illegal and unauthorized, being in direct disregard of the requirements of the will. The sale of it at this

time could not be made on favorable terms, because of the great stringency in money matters, and it could not be sold except at considerable sacrifice. It is very valuable, and if sold under favorable conditions, ought to bring $150,000 or other large sum, especially if sold after being laid out into lots as directed by the will. If the sale takes place and the proceeds are used and distributed as contemplated by the agreement, petitioners would be subjected to great embarrassment, if not positive loss in securing their rights; a considerable part of the proceeds would go to G. C. Napier for the purpose above mentioned, and as he has very little property besides the mortgaged plantation in Alabama, it would be difficult if not impossible to recover from him the portion of the proceeds which would be paid over to him under the agreement, especially as the property he owns apart from his interest in the estate is mainly in Alabama and beyond the jurisdiction of this court. Considerable expense also would have to be incurred in any attempt to recover the money from him. If the agreement should be held binding, or carried into effect so far as the relinquishment of the widow is concerned, petitioners are equitably entitled to share in the benefits of the relinquishment, because, under the agreement, the relinquishment is in large part paid for by income from property to which, under the will, they are equally entitled with the other children and grandchildren of testator after proper allowances for the advancements. Besides, as some of the parties to the agreement do not reside in the county of Bibb, but in different counties in Georgia and other States, any attempt to compel the parties to refund any portion of the proceeds of the sale would be attended with considerable expense and other loss to petitioners. The administration of the estate under the agreement in part or in whole is illegal, unauthorized and injurious to petitioners' rights and

interests, etc. They have never received from the executors any part of the estate, but the executors have ignored them as parties entitled to participation. This has been done without the consent of petitioners under the unauthorized assumption that, by reason of the advancements to E. T. Napier, they are entitled to no part of the estate. They are entitled to have the estate administered strictly in accordance with the will, and if the executors in the use of any part of the property or income of the estate have purchased other property, either now possessed by them, or to which they have procured title with expectation of future enjoyment, petitioners have a right to share therein, and in all the benefits accruing therefrom, in the same manner and to the same extent as they would have in the property devised under the will. In view of the complications mentioned, they are entitled to have their rights ascertained and settled before any further attempt is made to carry. out the agreement. The property belonging to the estate which has not been distributed, either in whole or in part, is worth $250,000 or other large sum. The property devised to Mrs. M. L. Napier by the will is worth $200,000 or other large sum. At the time she signed the agreement she was about sixty-three years old, and easily influenced both on that account and on account of her confidence in defendants, and because of her want of familiarity with such business transactions as the agreement relates to. It was signed shortly after her husband's death and under circumstances unfavorable to any careful or strict examination of it, and she was misinformed as to its nature and effect, so far as related to the disposition of the property belonging to her under the will after her death. The executors have not made regular annual returns as required by law, and an instance is stated as to a certain balance of $500 in favor of the estate as shown by earlier re-

turns, which later returns do not appear to account for, nor does it appear by the returns what income was derived from the "swamp lands" in different years and how disposed of, etc.

The defendants demurred on the grounds that no cause of action was set forth; that the plaintiffs have no right now to institute or maintain the case, because if they have any cause of action it will not accrue until the death of Mrs. M. L. Napier; that the widow of E. T. Napier is not a proper party plaintiff; and that the other parties to the agreement and who are legatees under the will are not made parties to the petition. Defendants answered: It is true the agreement was not signed by any of the children of E. T. Napier, but not true that it was the intention of the agreement to modify or change the will in any manner, but to carry out the same in effect. The agreement was executed shortly after the death of testator, was prepared by learned counsel representing the parties thereto, and was signed by Mrs. M. L. Napier freely, voluntarily and after due deliberation and consultation with counsel; and from its execution until shortly before the filing of the petition, it has been unquestioned in the family of testator, so far as defendants know or are advised. It is not true that defendants or any other member of the family of testator, who are legatees, have ever assumed that petitioners have no interest in the estate; on the contrary defendants have stated and now state that it is their understanding that, after full performance of the agreement so far as the property conveyed thereunder is concerned, petitioners will participate in the will in the balance of the estate, after the other legatees have been advanced, according to the scheme of the will, with E. T. Napier. Upon the execution of the agreement the property mentioned in the second item of the will became the absolute property of Mrs. M. L. Napier,

and she could make any disposition of it agreeable to her, and thereupon she executed said instrument and made the disposition of the property as contained therein. The agreement has not been substituted for the will, and defendants have not acted under it to the exclusion or denial of the terms of the will. It is true they have not divided the "swamp lands" at all, but not true that the "pine lot" has not been subdivided or laid out; it has been subdivided according to a plat now in existence. Nor is it true that defendants have sought to convert the fee simple estate of the widow in the homestead and ninety acres, and to appropriate the fee in this property to themselves, for, upon the execution of the agreement, under the will the fee vested in the widow and she had the right to dispose of it. It is not true that defendants have appropriated all the other property in a different way from that provided in the will. The income from the property has been very small, and will fall far short of bringing up any of the defendants, or any other legatees, to the advancement made E. T. Napier, and until the other legatees have been advanced to E. T., defendants have the right under the will to distribute the property among themselves in any manner they may agree upon and as they did agree upon. Defendants have not paid any part of the estate to Mrs. M. L. Napier in consideration of the execution of the agreement by her, but whatever money has been paid, or whatever property she has received in consideration of the agreement, was money or property coming to defendants under the will. Defendants have from time to time made returns to the ordinary, which are of record and show all the money that has passed through their hands belonging to the estate or in any wise connected with it, and upon an accounting it will appear that there is no one of them nor any one of the legatees who has received a tithe of the estate sufficient to ad-

vance them with E. T. Napier.    It is not true that Mrs.
M. L. Napier did not understand the agreement when
she signed it, nor that she understood it as stated in the
petition.   She did not intend any of the property given
her in the will to go to others than those named in the
agreement, and it is not true that she would now sign
an instrument as stated in the petition; she refused to
sign a paper authorizing some person to institute a
suit to cancel or abrogate the agreement.   Defendants
do not believe that she has stated that her understand-
ing and intention was as stated in the petition, and it is
not true that G. C. Napier prevented her attaching her
signature to a paper in which she declared it was her
understanding and intention that the agreement should
embrace petitioners; on the contrary he simply ex-
plained to her what said paper purported to be, and she
thereupon declared and protested that she would not
sign any such paper.   For some time there has been
some inducement upon the part of the petitioners to per-
suade her to make some acknowledgment in writing
affecting the validity of the agreement, and an attempt
to impress her with the idea that, under the agreement,
petitioners would be excluded from participating in any
portion of the estate of testator; and she did state, in
response to such suggestions, that it was not true they
would be excluded from any participation in testator's
estate, but that, after the other legatees had been ad-
vanced as was E. T. Napier, then all the legatees would
share in the estate, excepting of course the property
which she had conveyed to these defendants and the
other parties mentioned in the agreement.   It is true an
advertisement for sale of the "pine lot" was made by
defendants as set forth in an exhibit to the petition, but
this was done for the purpose of administering the same
under the will and distributing the proceeds to the leg-
atees mentioned in the will.   It was not the purpose of

defendants to use the proceeds in any way to interfere with plaintiffs' rights ; a full account of everything realized from any sales will be kept and each legatee charged with the amount received, so that in the general accounting it may be seen whether the amounts have been paid over to the legatees so as to make them equal under the will. The "pine lot" is in the suburbs of Macon, and defendants have held it until it is worth more then ten times its value at the time of the probate of the will. Plaintiffs will receive the benefit of this, in case the shares of the heirs should be made equal to the advancement to their father. Had the property been sold shortly after the probate, under the terms of the will, as would have been done but for the agreement, the shares of the advanced legatees would not have exceeded $17,-000 each. Defendants for years have assisted in the support of their mother under their agreement, she has reaped the benefit of it from her children, and in equity and good conscience it should not now be disturbed. The agreement does not affect in any way the land which was being offered for sale, but as to this defendants were proceeding under the will, as they deemed best for the general interest of the estate, and it would be a great hardship upon them to stop the distribution of the estate, tie up the property and prevent the carrying out of the will on such a claim as is now sought to be enforced against them.

Upon the hearing copies of the will and agreement were put in evidence, and a certificate from the ordinary to the effect that the returns of the executors showed that neither of them had charged himself with any income of any sort from the "swamp lands," interest or other income from the note of Moultry, or dividends or other income from stock in the Macon Manufacturing Company; but that there appeared in the return of H. V. Napier, recorded in October, 1885, a charge of cash for

rent, houses and lands, from January, 1883, to September, 1885, $116.50. There were affidavits of three of petitioners and of another, in substance as follows: In a conversation had by J. H. Napier, one of the petitioners, with his grandmother about three months ago, she stated that at her death, as she understood the agreement, under her husband's will, the residence and ninety acres of land were to go equally to her children and the children of such of them as should be dead at the time of her death. A short time afterwards he had another conversation with her, in which he stated to her that the agreement did not provide that he and his brothers and sisters and their mother should have any interest in the property left her by the will. She said that she had always understood the matter differently, and wanted to have the agreement set aside if his statements as to its effect were correct. Either he or his brother asked her, after she had made this statement, if she wanted a paper prepared stating what her intention and understanding was in signing the agreement, and if she would sign such a paper. She stated that she did and would. He and his brother had such paper prepared and got Mr. Lanier and another to go with them to her residence, to submit the paper and witness her signature. After they reached the residence and J. H. Napier and his brother went into the room where she was, and one of them read the paper, G. C. Napier, who was present, said to her she should not sign any paper. The others were asked to come into the room, and in their presence she was asked if she had not voluntarily stated to J. H. and his brother that she wanted such a paper prepared for her signature, and that her intention and understanding in signing the agreement was that her property should at her death go equally to her children then living, and to the children of such of them as should be then dead, just as the other property given by the will to the children and grand-

children was to be divided. To these questions she gave an affirmative answer. The said paper was not signed because of the interference of G. C. Napier. Since the advertisement by the executors offering for sale the "pine lot" and soon after it was first published, II. V. Napier, one of the executors, stated to J. H. Napier that he did not personally approve of the sale, but that his brother G. C. needed a considerable sum to pay off a mortgage or mortgages on his Alabama plantation, and the offer of the land for sale was mainly caused by this necessity. In conversation at different times with some of the executors, it was stated by them that J. II. and his brothers and sisters had no interest in their grandfather's estate because of the advancement made to their father, and that the estate would be divided by the executors to the other legatees, under and in accordance with the agreement, or words to that effect. About two weeks ago, and at other times, Mrs. M. L. Napier told Mrs. Proudfit, one of petitioners, that it was her understanding and wish that the whole estate should be divided equally between all of her children and children of deceased children, after each had received $30,000, which would make them equal with E. T. and Nathan Napier; that this was the way she understood it until the other children told her that this was not the way, and that she could not break the agreement. She further told her that the agreement was first entered into by them for fear she might will all her property to some one child, and that it was made to provide a competency for her so long as she lived, but that only two of them had ever paid her anything. She made these statements freely and voluntarily, and regretted that the children would not be willing to divide the property equally after her death. She also made a similar statement to J. H. Napier and his brother in the presence of G. C. as to the payment to her of the annuity of $250.

The defendants introduced the affidavit of Mrs. M. L. Napier, in substance as follows : Within the time allowed in the will she executed an instrument whereby she yielded up and relinquished her dower, year's support, etc.   Although she is very old, her mind is clear and her recollection about the main facts connected with the relinquishment of her dower and the signing of the paper of October 31, 1870 (the agreement was executed September 17, 1870), is clear and strong.   At the time of its execution, as she now recollects, all of her living children were present and it was executed by her after full, deliberate and complete consideration of its mean-ing and effect.   She was at the time represented by counsel, and during the consultations and conversations which led up to the execution of the instrument, con-sulted with them, and the instrument was executed by her by and with the advice, direction and opinion of one of them concerning its legality as well as its propriety and justice.   She was not induced by any one to sign this paper, nor was any misrepresentation made, nor any suggestion that it was in any manner different from what she then and now understands it to be.   She understood and now understands that the purpose of the agreement was to yield up her dower in accordance with the will, and this being done, that she was then to hold in fee simple the property mentioned in the second item, and so holding it was the full owner of it with the right to dispose of it as she saw fit, and that she thereupon dis-posed of it according to the agreement which was then made, which has stood unquestioned from then until now, and which she now here again solemnly ratifies and reaffirms.   It was then and is now her understanding that E. T. Napier had been advanced by her husband $30,-000, and that, according to the will as it was understood without exception among the members of the family, and as she was advised by her counsel, the other chil-

dren should be brought up, if possible, out of the estate (remaining after the legacy bequeathed to her) to the amount of $30,000, and that the balance of the estate, after the payment of expenses of administration, should be divided under the will. It never was the intention of the instrument which she had executed to affect in any manner the rights of the children of E. T. Napier in that portion of the estate which did not pass to deponent under the will. The property she disposed of under the agreement was the property coming to her under the will, and constitutes no part of the estate now to be divided under the will. The instrument was executed in good faith upon her part, and, she then believed and now believes, was for the best interest of her family. She then understood and now understands that it was a solemn contract for a valuable consideration from time to time, and has had the benefit thereof, and that being a contract performed by one side, she would not seek to violate it or change its terms in any particular. A short time ago J. H. Napier approached her in reference to the agreement. She denies that she stated to him in substance that at her death, as she understood the agreement, the residence and ninety acres of land were to go equally to her children and the children of such of them as should be dead, but in such conversation she remembers stating very distinctly that the homestead and ninety acres belonged to the parties named in the agreement according to the terms of it, and that after those children had been brought up to the advancement of E. T., the balance of the estate of her husband was to be divided equally between them all under the will; nor did she state that she had always understood that the agreement referred to was intended to give J. H. Napier and his brothers and sisters an interest in this property left to her under the will, but on the contrary stated and understood that this property belonged ab-

solutely to her children named in the agreement, and
that neither he nor his brothers and sisters would have
any interest in that property.   She recollects the occa-
sion of the visit of J. H. and his brother with Mr. Lanier
and another.    On that occasion J. H. read to her a
paper which she did not understand until it was ex-
plained by G. C. Napier, and when she understood that
it purported to be looking to an abrogation of the agree-
ment and contained stipulations that her said grand-
children were to share equally in the property referred
to at her death, and that it further purported to be an
authority to the children of E. T. Napier to institute
proceedings to have the agreement cancelled or nullified,
she declined to sign it.

G. C. Napier made affidavit: He recollected very dis-
tinctly the occasion of the visit of Mr. Lanier and others
to his mother.   Having occasion to do a simple piece of
work for her, he went over to the house and found J. H.
Napier in the room with her.    J. H. went out, and de-
ponent noticed a paper sticking out from under the
pillow of the couch where his mother was resting.   He
picked up the paper and asked her what it was and saw
it was a copy of his father's will, and he asked her if
J. H. wanted her to sign any paper; she said he did,
but that she had not seen it.   In a few minutes J. H.
returned, and deponent asked him what it was that he
wanted her to sign; he replied it was a will.   Deponent
requested him to let him see it, and J. H. objected,
stating that deponent's mother had made a will upstairs
sometime before, and that J. H. and his family were not
consulted about it.    To this deponent replied that they
were as much represented as anybody and got as much
in said will as anybody.   Then J. H. replied that he
would read the paper and did read it, not very loudly,
and his mother, who is hard of hearing, said she did not
understand it.   The paper was in substance, so far as

v 89-5

deponent can recollect, a paper for her signature stating that, regardless of any advancement of $30,000, she wanted J. H. and his brothers and sisters to share equally in her portion of the estate, and the paper was further intended to be authority to J. H. and his brothers and sisters, or some of them, to institute suit to set aside the agreement of 1870. Deponent cannot give an accurate statement of the paper, but has stated the substance of it as it impressed him. He stated in the presence of J. H. what he understood the paper to mean to his mother, and she thereupon refused to sign it, J. H. being present all the while. Deponent's mother then sent for Mr. Lanier, and when he came in, told him that she would not sign this paper, nor would she sign any paper until all her children were present; that she did not want any lawsuit brought on. J. H. did not in deponent's presence ask her if she had not voluntarily stated to him, J. H., that she wanted such a paper prepared for her signature, nor did she state that her understanding in signing the agreement was as stated in the testimony for plaintiffs. From conversations with her, deponent says that J. H. or some of his family had endeavored to produce the impression upon her mind that they were to be cut off entirely from participation in testator's estate, and she stated repeatedly that it was her understanding and intention that J. H. and his family should, after accounting for the advancement made their father, share equally with the other children of testator under the will, in the property of the estate other than the property she had given to the parties mentioned in the agreement, etc. So far as his connection with the agreement was concerned, he never used in any manner any improper influence whatever upon his mother to induce her to sign it, nor has he since sought to have it avoided or changed in any way, and the only interference he ever had was on the occasion referred to, when he simply ex-

plained to her what he understood the paper brought her by J. H. to be and to mean.

An affidavit of the wife of H. V. Napier was to the effect that she was present at the interview between J. H., G. C. and Mrs. M. L. Napier; that the explanation of the paper given by G. C. to his mother was, that it in effect authorized the parties named in it to sue for the purpose of annulling the agreement of 1870; that his mother stated she was not willing that any one should commence proceedings for such purpose, sent for Mr. Lanier and stated to him that she declined to sign any such paper as that, unless all her children were present and informed about it; that when J. H. read the papers over, deponent heard G. C. ask his mother, after explaining what he understood the paper to mean, whether she wished to sign it, as its intention was to authorize a lawsuit between the children; and that no further persuasion was used. There was evidence that when the appraisement of the estate was made on October 13, 1870, the entire property was appraised at $76,735, which was a reasonable appraisement, and in the opinion of the executors was the full value of the entire property belonging to the estate; that all the income from the "swamp lands," the factory stock and other property mentioned in the certificate of the ordinary, was paid over and used by the widow of testator for her own use; that the appraised value of the "swamp land" was $18,000 and of the factory stock $10,000; that the Moultry note was not included in the appraisement, was always disputed, was barred by the statute of limitations, and the claim was finally made by the debtor payable to Mrs. M. L. Napier; that the factory stock was lost within four years after the agreement, as the company suspended; that the notes and accounts amounted by the inventory to about $32,000, but of these very few were of any value; and that the total amount paid to the legatees, charging all

parties with amounts received and with which they are chargeable, is not over $13,000. There was an affidavit of G. C. Napier, that a map accompanying the affidavit was made at the time it bore date, which was December, 1871, for the executors of the estate, that it covered the "Pine lot," and that returns had been made for a portion sold off. This map showed the division of land in controversy into blocks with streets or ranges between, each block containing four lots, except on the outer edges of the map where the blocks have only two. The lots laid out on the map were none of them as much as an acre and were of different dimensions. The blocks were rectangular and contained more than an acre each, with streets between each block.

HILL, HARRIS & BIRCH and DESSAU & BARTLETT, for plaintiffs in error.

LANIER, ANDERSON & ANDERSON, by brief, *contra.*